```
                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF MISSISSIPPI
                      JACKSON DIVISION
```

LAFAYETTE INSURANCE COMPANY                          PLAINTIFF


VS.                          CIVIL ACTION NO. 3:10cv336 TSL–FKB


EDWARD PEERBOOM, HEATHER
PEERBOOM, ABSOLUTE FOUNDATION
SOLUTIONS, INC., ET AL.                              DEFENDANTS


## CORRECTED MEMORANDUM OPINION AND ORDER

Plaintiff Lafayette Insurance Company filed the present action seeking a declaratory judgment that its commercial general liability insurance policy issued to defendant Absolute Foundation Solutions (Absolute) provides no coverage for damages to the home of Edward and Heather Peerboom, which the Peerbooms have claimed was caused by Absolute's negligence in performing certain work on their home.  The case is presently before the court on Lafayette's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Peerbooms and Absolute have separately responded to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes the motion is well taken and should be granted.

For purposes of the present motion, the following facts are not in dispute:

Edward and Heather Peerboom's home in Hattiesburg, Mississippi flooded five times during an approximate eight-year period, from January 1998 to August 2005.  In August 2009, after they were informed by FEMA that it would no longer provide them flood insurance if the home were not elevated, the Peerbooms hired Absolute to raise the structure twenty-four inches above the flood zone so it could be reshored and the flood insurance on the house could be continued.  In general terms, the project involved excavating beneath the home's slab foundation, placing hydraulic jacks at various locations below the slab, and using the jacks to evenly raise the structure, a few inches at a time.  By midday on August 28, 2009, Absolute had raised the structure approximately twenty-one inches without incident.  Absolute's crew then left for lunch, and returned to discover that the house had fallen, resulting in substantial damage to the entire structure.

On February 25, 2010, the Peerbooms filed suit against Absolute and Caballero in the Circuit Court of Lamar County, Mississippi, asserting claims of negligence, breach of contract and fraud, and seeking compensatory damages for the total destruction of their home and their resulting emotional distress, and demanding punitive damages on account of Cabellaro's alleged fraud.[1]  Upon receiving notice of the suit, Absolute filed a claim

---

[1] See Edward Peerboom and Heather Peerboom v. Absolute Foundation Solitions, Inc., and Cesar Caballero, Case No. 2010-36 (Lamar County Cir. Ct.).

with Lafayette under its CGL policy, and tendered defense of the underlying action to Lafayette.  Lafayette denied coverage, and agreed to defend Absolute and Cabellero, under reservation of rights, following which Lafayette filed the present action, seeking a declaratory judgment that it is not obligated to defend or indemnify Absolute/Cabellero under its CGL policy, and it now seeks summary judgment on its complaint herein

Lafayette's policy is a standard CGL policy which requires Lafayette to "pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage,' ... caused by an 'occurrence,'" and to defend Absolute against any lawsuit seeking such damages.[2]  Among other bases for its motion, Lafayette contends that any "property damage" alleged in the

---

[2]    The policy's coverage Part A states:
A. Coverage under Part A–Bodily Injury and Property Damage Liability
1. Coverage under the Insuring Agreement
a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But . . .
b.  This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage
....

Peerbooms' complaint was not caused by an "occurrence," as that term is defined in the policy and interpreted under Mississippi law.  It further argues that even if an "occurrence" had been alleged, the insureds' actions, and the damages flowing therefrom, are subject to one or more exclusions in the policy, including, *inter alia*, what are known as "business risk" exclusions.[3]

Under Mississippi law, which applies in this diversity action, the determination whether a liability carrier has a duty to defend depends on the policy language and the allegations of the complaint.  QBE Ins. Corp. v. Brown & Mitchell, Inc., 591 F.3d 439, 443 (5th Cir. 2009) (citing U.S. Fidelity & Guar. Co. v. Omnibank, 812 So. 2d 196, 200 (Miss. 2002)).  Under this so-called "eight-corners" test, the allegations in the complaint are analyzed against the language in the policy to determine coverage

_____

[3]     Lafayette also contends the Peerbooms' claims for fraud, breach of contract and punitive damages do not allege an "occurrence" under the policy and Mississippi case law. Additionally, it argues that there is no coverage under Part B, for "Personal or Advertising Injury," as the facts alleged in the underlying action do not implicate any of the listed "offenses" making up the definition of "Personal and Advertising Injury."
       Absolute has not responded to Lafayette's motion as it pertains to coverage for the underlying breach of contract claim, and has expressly confessed Lafayette's arguments that the underlying action does not allege "bodily injury" or "Personal and Advertising Injury," as defined by the CGL policy, and that coverage does not lie for the Peerbooms' fraud claim.  And in the court's view, the Peerbooms have implicitly confessed the motion on these issues by making no response to Lafayette's arguments on these points.  The parties' dispute thus centers on whether any of the "property damage" claimed by the Peerbooms was caused by an "occurrence," and if so, whether coverage is excluded under the business risk exclusions.

and the duty to defend.  Id.  If the complaint alleges facts which are arguably within the policy's coverage, a duty to defend arises.  Id.  See Sennett v. U.S. Fidelity & Guar. Co., 757 So. 2d 206, 212 (Miss. 2000) (stating, "[a] liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy").

In their complaint against Absolute, the Peerbooms allege that they entered into a contract with Absolute "to raise [their] structure up to 24 inches above its previous level while maintaining the integrity of the structure;" that on August 28, 2009, while "Absolute was performing the job on the Peerbooms' structure ... [t]he defendants failed to use approved engineering techniques, or failed to use generally accepted methods in performing the jacking operations, or failed to use sufficient and proper equipment in performing the jacking operation," as a result of which "the leveling of the ... house failed causing it to be completely destroyed."  They further allege that Absolute "did not provide even support to keep the structure's integrity and thus uneven forces caused the structure to break and collapse," resulting in a total loss of their home.  The complaint further alleges that Caballero falsely represented to them that his company "had the requisite equipment and expertise to safely

5

support the house by jacking it up evenly, so as to not cause bending."

Three requirements must be met in order to trigger a duty to defend, and potentially indemnify, which are: (1) the Peerbooms must allege they sustained a loss because of "property damage"; (2) the alleged damage must be alleged to have been caused by an "occurrence"; and (3) there must be no valid exclusion that applies.  See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399–400 (5th Cir. 2008).  It is undisputed that the Peerbooms allege they sustained a loss caused by "property damage."  The issues are whether the alleged "property damage" was caused by an "occurrence" and if so, whether any exclusion applies.

Lafayette's policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  While the policy defines "occurrence" as an "accident," the policy does not define "accident."  However, in a series of decisions, the Mississippi Supreme Court has provided guidance as to the meaning of the term. The court, for example, has explained that an "insured's intentional actions [do] not constitute 'accidents,' and the damages resulting therefrom [do] not amount to 'occurrences,'" even if the insured acts in a negligent manner.  Architex Association, Inc. v. Scottsdale Insurance Co., 27 So. 3d 1148,

6

1159 (Miss. 2010).  That is, "even if an insured acts in a negligent manner, that action must still be accidental and unintended to implicate policy language." Id. at 1158 (quoting United States Fidelity & Guar. Co. v. Omnibank, 812 So. 2d 196, 197 (Miss. 2002)).  Moreover, since "[a]n accident by its very nature produces unexpected and unintended results[,] [i]t follows that bodily injury or property damage, expected or intended from the standpoint of the insured, cannot be the result of an accident." Omnibank, 812 So. 2d at 200.  Thus, an act is not an "accident," and thus not an "occurrence" if "(1) the act is committed consciously and deliberately, without the unexpected intervention of any third force; and (2) the likely (and actual) effect of the act was well within the actor's foresight and anticipation." Allstate Ins. Co. v. Moulton, 464 So. 507, 509 (Miss. 1985).  See also Omnibank, 812 So. 2d at 201 (stating that "a claim resulting from intentional conduct which causes foreseeable harm is not covered, even where the actual injury or damages are greater than expected or intended").

Recently, in Architex Association, Inc. v. Scottsdale Insurance Co., the Mississippi Supreme Court considered the meaning of "occurrence" in the context of an insured's claim for coverage for property damage due to a construction defect.   27 So. 3d 1148.  In that case, Architex, the contractor on a hotel construction project, filed suit against its CGL carrier,

7

Scottsdale Insurance Co., after Scottsdale failed to defend or indemnify Architex in the project owner's suit against Architex to recover damages based on allegations that the building was a total loss due to a subcontractor's failure to place rebar in the foundation.  The trial court granted summary judgment for Scottsdale, reasoning that although Architex did not intend its subcontractors to do defective or improper work, it "intentionally subcontracted the ... work to [subcontractors]"; "the hiring of those subcontractors was not an 'accident,'" and, "the hiring of the subs, was a 'course consciously devised and controlled by [the insured]' which undeniably set in motion the 'chain of events leading to the injuries complained of.'" Id. at 1154.  On appeal, the Supreme Court considered "whether [Architex's] intentional hiring or utilization of subcontractors to perform work on one of its projects negates coverage included in the ... policies issued by Scottsdale ... to Architex."  Id. at 1149.

The court began by acknowledging "a clear jurisdictional split regarding whether defective subcontractor construction constitutes an 'occurrence' under a CGL policy," with "'one line of cases [holding] that faulty or improper construction does not constitute an accident [and that] the damage is [instead] the natural and ordinary consequence of the insured's act,'" and "'[t]he other line of cases [holding] that improper or faulty construction does constitute an accident as long as the resulting

damage is an event that occurs without the insured's expectation or foresight.'" Id. at 1156 (quoting Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co., 281 Kan. 844, 137 P.3d 486, 491 (2006)).

The court in Architex considered that "part of the confusion between insurers and insureds, and in conflicting opinions of courts, is caused by branding faulty workmanship, defective work, and other similar phrases as 'occurrences' or not." Id. at 1159-1161. The court stated that faulty or improper construction, or defective workmanship (or gaining knowledge of same) is not in itself an "occurrence," but rather is "typically *the result of* either accidental or intentional acts," id. at 1157 (emphasis added), and it noted that CGL policies "are designed to provide liability protection for the general contractor and their subcontractors *for accidental, inadvertent acts* which breach accepted duties and proximately cause damage to a person or property," id. at 1156 (emphasis added). The court concluded that whether a contractor's acts are intentional, or instead accidental/inadvertent, will depend on the facts of the particular case. Making this point, the court wrote:

> Faulty workmanship, defective work, et al., may be accidental, intentional, or neither. ... [T]he underlying facts will determine whether the complaint of "property damage" (defective or faulty workmanship) was proximately caused by breach of a recognizable duty and whether that breach was accidental or intentional; or, whether the "property damage" was caused by neither.  In two of the three aforementioned scenarios, no coverage

9

would exist.  Only when "property damage" is proximately
caused by an accident (an inadvertent act) does an
"occurrence," as defined by the policy, trigger
coverage.

Id. at 1161.  See also Carl E. Woodward LLC v. Acceptance Indem.
Co., No. 1:09cv781-LG-RHW, 2011 WL 98404, 6-7 (S.D. Miss. Jan. 12,
2011) (stating that "pursuant to the Architex decision, faulty
workmanship and the hiring of a subcontractor are not as a matter
of law excluded from coverage, and this Court must look to the
facts and evidence presented in this case to determine whether
coverage exists"); National Builders and Contractors Ins. Co. v.
Slocum Const., LLC, Civ. Action No. 2:09cv217KS-MTP, 2010 WL
2545450, 8 (S.D. Miss. June 18, 2010) (recognizing that under
Architex, "construction defects may, in fact, constitute an
'accident' or 'occurrence' under an ISO CGL policy, based upon the
underlying cause of the defects").

    In Architex, the court concluded the record was
insufficiently developed for the court to answer with certainty
the question whether the contractor's or subcontractor's actions
which caused the construction defect were "accidental, intentional
or neither."  Id.  In the court's opinion, the same is true in the
case at bar.  Obviously, in the house-jacking operation, something
went awry; otherwise the Peerbooms' house would not have fallen.
However, the Peerbooms' complaint against Absolute does not put
forward a *specific* theory of why the house fell.  The Peerbooms
broadly allege in the underlying complaint that it fell because

10

Absolute "failed to use approved engineering techniques, or failed to use generally accepted methods in performing the jacking operations, or failed to use sufficient and proper equipment in performing the jacking operation." Yet there is nothing in their allegations to indicate whether these alleged failures were intentional or accidental. Likely that is because, as the Peerbooms otherwise candidly allege, they do not "know the precise cause of the failure." They allege simply that, "[f]or reasons unknown to them, the structure's support system failed in at least one location, causing the structure to loose [sic] an even level, and eventually the entire structure broke."

Not only does the Peerbooms' complaint not identify what caused the house to fall, but to date, none of the parties has offered an explanation or theory, or, so far as the court is aware, even claims to have an opinion about what likely went wrong.[4] In their response to the present motion, the Peerbooms state that chief among the many questions that remain unanswered in this case is "why the house fell." Indeed, they assert the answer to this question is "perhaps unknowable." Jeff Junkins, an Absolute employee who participated in the Peerboom job for

---

[4] An August 31, 2009 report prepared by Lafayette adjuster Mickey Carney, of GAB Robins, recited that Hal Kane of Kane & Associates Engineers and Constructors was to investigate and develop theory(ies) about the cause, and indicated that Kane's report would be ready the first week of September 2009. The Peerbooms note in their response that although it is well past that date, Lafayette has not produced any report from Kane.

11

Absolute, has submitted an affidavit in which he states that he is "still unable to determine what caused the Peerboom home to rotate and collapse."

In determining whether coverage exists, or the potential for coverage exists so that Lafayette has a duty to defend, and perhaps to indemnify, depending on the outcome of the underlying case, it is the court's charge to evaluate whether the allegations in the underlying complaint, or the "true facts" made known to the insurer, fall within the coverage of the policy.  QBE Ins. Corp., 591 F.3d at 444.  Here, the Peerbooms' complaint leaves open the possibility that the "property damage" at issue was proximately caused by an accident (an inadvertent act), and that their claimed "property damage" was thus the result of an "occurrence."[5] Accordingly, summary judgment cannot be granted on this basis.[6]

Of course, "even if there has been 'property damage' caused by an 'occurrence,' coverage is not automatic.  It also must be

---

[5]   Since the act which likely caused the claimed "property damage" is as yet undetermined, then it is likewise not known at this point whether "the likely (and actual) effect of the act was well within [Absolute's] foresight and anticipation."  Allstate Ins. Co. v. Moulton, 464 So. 507, 509 (Miss. 1985).

[6]   Lafayette has argued that for the same reasons the Peerbooms' claimed "property damage" was not caused by an "occurrence", their claimed losses are excluded from coverage as "'property damage' expected or intended from the standpoint of the insured."  However, just as the court cannot conclude as a matter of law that the Peerbooms' claimed "property damage" was not caused by an "occurrence," the court cannot conclude as a matter of law that their claimed losses are excluded under the policy's "Expected or Intended Injury" exclusion.

ascertained, under the facts specific to each case, if any other exclusions and/or exceptions to exclusions apply." <u>Architex</u>, 27 So. 3d at 1161.  In its motion, Lafayette relies on the policy's exclusion of coverage for "property damage" to

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> ...
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

"Your work" is defined, in pertinent part, as "work or operations performed by you or on your behalf."

These exclusions, usually labeled j(5) and j(6) in standard CGL policies, are "business risk" exclusions, "common features in commercial general liability insurance policies that are designed to exclude coverage for defective work performed by the insured." <u>Mid-Continent Cas. Co. v. JHP Dev., Inc.</u>, 557 F.3d 207, 211 (5th Cir. 2009).  The "business risk" exclusions operate together to exclude  coverage for an insured's faulty workmanship, the rationale for the exclusions being that "faulty workmanship is not an insurable 'fortuitous event,' but a 'business risk' to be borne by the insured and not the insurer." <u>Acadia Ins. Co. v. Peerless Ins. Co.</u>, 769 F. Supp. 2d 229, 234 (D. Mass. 2010) (citing <u>Couch on Insurance 3rd</u>, § 129:11).  Thus, "[a] policy containing this

type of ["business risk"] exclusion ... treats differently the
risk that an insured's substandard services or supplies will cause
damage to his own work product and the risk that his slipshodness
will injure someone or something else." Federated Mut. Ins. Co.
v. Grapevine Excavation Inc., 197 F.3d 720, 725 n.22 (5th Cir.
1999) (citing Hartford Casualty Co. v. Cruse, 938 F.2d 601, 603
(5th Cir. 1991); see also Wilshire Ins. Co. v. RJT Const., LLC, 581
F.3d 222, 226 (5th Cir. 2009) ("[a] CGL policy generally protects
the insured when his work damages someone else's property.  The
'your work' ("business risk") exclusion prevents a CGL policy from
morphing into a performance bond covering an insured's own
work.")(citing Mid-Continent Cas. Co., 557 F.3d at 212).

     The subject exclusions apply only to damage caused while the
work is ongoing, id. at 213, a requirement that is clearly met
here, since the claimed damage occurred during the house-jacking
operation.  By its terms, exclusion j(5) applies only to "property
damage" to "[t]hat particular part of real property on which [the
insured] [is] performing operations, if the 'property damage'
arises out of those operations.  And, the Fifth Circuit has held
that "the plain meaning of exclusion j(6) is that property damage
only to parts of the property that were themselves the subjects of
the defective work is excluded." Id. at 214.

     The court in ACUITY v. Burd & Smith Construction, Inc.
addressed the nature of a CGL policy, and of business risk

14

exclusions, stating, "[A] CGL policy is not a performance bond and is not intended to protect a contractor's business risk to replace or repair defective work that does not conform to the agreed contractual requirements; rather, the policy is intended to protect the insured from liability because the insured's goods, products, or work cause bodily injury or damage to property other than the insured's work product."  721 N.W.2d 33, 41 (N.D. 2006) (citing Grinnell Mutual Reinsurance Co. v. Lynne, 686 N.W.2d 118 (N.D. 2004)).  The court wrote:

> Consistent with that purpose, other courts have generally construed those property damage exclusions to exclude coverage when the property damage is to the property on which the insured has contracted to perform operations and not to exclude coverage when the property damage is to property that the insured was not performing operations on.  See Hartford Cas. Co. v. Cruse, 938 F.2d 601, 603–04 (5th Cir. 1991); Southwest Tank and Treater Mfg. Co. v. Mid–Continent Cas. Co., 243 F. Supp. 2d 597, 603–04 (E.D. Tex. 2003).....  Some courts have specifically recognized that facts in each case are determinative of the particular part of property on which an insured is performing its operations and that buildings may be divided into parts in attempting to determine which part or parts are the object of the insured's work product.  A common thread for deciding whether there is coverage for property damage is the scope of the insured's contract.  See Hartford Cas. Co., 938 F.2d at 603....

Id. (additional citations omitted).  As one court has observed, "[a]lthough it may be possible to define the scope of the instant exclusion in the abstract .... buildings can be divided into so many parts that attempting to determine which part or parts are the subject of the insured's operations can produce several

15

reasonable conclusions." <u>Travelers Cas. and Surety Co. v.</u>
<u>Dormitory Authority State of N.Y.</u>, 732 F. Supp. 2d 347, 366
(S.D.N.Y. 2010) (quoting <u>Columbia Mut. Ins. Co. v. Schauf</u>, 967
S.W.2d 74, 80 (Mo. 1998). In the case at bar, a determination of
whether exclusion j(5) or j(6) applies to the Peerbooms' claimed
damage depends on identifying "the particular part" of the
Peerbooms' property on which Absolute was working, or "performing
operations," at the time of the alleged "occurrence."

As in the case at bar, the "decisive issue" in <u>Hartford</u>
<u>Casualty Co. v. Cruse</u>, relied on by defendants, was "definition of
[the insured's] work product." 938 F.2d 601, 603 (5th Cir. 1991).
In <u>Cruse</u>, homeowners had sued the insured, alleging it defectively
performed foundation leveling services on their home, which
resulted in diminution in value of the home and damages to various
other parts of the house (e.g. "doors out of plumb, surfaces such
as window sills and counter tops abnormally out of level,
separation of interior walls from the floor, and cracked
sheetrock"). The policy at issue in <u>Cruse</u> excluded "property
damage to work performed by ... the named insured arising out of
the work or any portion thereof...." <u>Id</u>. at 603. The court held
that the exclusion "only applie[d] to the cost of repair to the
foundation itself, and [did] not apply to the diminution in the
value of the Cruses' home that remained after correction of J&J's

16

faulty work, and to repair costs for other property... to the extent that these particular items of damage require repair other than to the foundation itself." Id. at 604. The court stated:

> The Cruses hired J&J (the insured) to perform foundation work. Damages due to defective foundation work that affected property other than the foundation do not fall within the terms of Exclusion (o), which "carves out of the policy damage to the particular work performed by the insured, but not the overall damage that the incorporation of the defective work product causes to the entire entity." Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401, 421 (5th Cir.) (work product not the ship, and not even the entire turbine, but only the components of the turbine that insured attempted to repair or replace), cert. denied, 459 U.S. 1036, 103 S. Ct. 447, 74 L. Ed. 2d 602, 459 U.S. 1036, 103 S. Ct. 448, 74 L. Ed. 2d 603 (1982); accord Travelers Ins. Co. v. Volentine, 578 S.W.2d 501, 503-04 (Tex. Civ. App.-Texarkana 1979, no writ) (insured's work or work product was repair of engine valves only, thus coverage extended to other parts of damaged engine).
>
> J&J performed work on the foundation only, not the entire house, and this fact distinguishes the present case from those cases where the general contractor undertakes to construct or reconstruct an entire structure, and damage is limited to that structure. See, e.g., [T.C. Bateson Constr. Co. v. Lumbermens Mut. Casualty Co., 784 S.W.2d 692, 697-98 (Tex. App.-Houston [14th Dist.] 1989, writ denied)(business risk exclusion applies because builder contracted to construct entire library and all damage was to building itself); Sarabia v. Aetna Cas. and Sur. Co., 749 S.W.2d 157, 157-58 (Tex. App.-El Paso 1988, no writ) ("major overhaul" of a diesel truck engine, with no damage "after the overhaul other than what [insured] had repaired, replaced or reworked"); [Eulich v. Home Indemnity Co., 503 S.W.2d 846, 849 (Tex. Civ. App.-Dallas 1973, writ ref'd n.r.e.)(construction of entire building; exclusion applied to damage to building after it collapsed due to installation of steel member with less strength than required by contract).

938 F.2d at 603-04.

17

The facts presented in <u>Wilshire Insurance Co. v. RJT Construction, LLC</u>, also relied on by defendants, were similar to those in <u>Cruse</u>.  RJT Construction, the named insured under a CGL policy, was hired to "raise[], level[], and stabiliz[e] the foundation of the residence that had been induced to move as a result of the accidental discharge of water from a plumbing system."  581 F.3d at 224.  Some five years after RJT completed its work, cracks appeared in the walls and ceiling of the home, which the owner attributed to defective foundation repairs by RJT.  At issue in <u>Wilshire</u> was the "your work" exclusion, a "business risk" exclusion of coverage for "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  The court held that "[t]he exclusion precludes coverage for the cost of repairing RJT's own work, the foundation. ... The exclusion, however, only precludes coverage for liability for repairing or replacing the insured's own defective work; it does not exclude coverage for damage to other property resulting from the defective work."  <u>Id</u>. at 226.  The court observed:

> The complaint alleges that the faulty foundation caused damage to other parts of the house that RJT did not work on including the walls and ceilings.  The "your work" exclusion does not preclude coverage for damage to the parts of the house resulting from the allegedly faulty foundation.  Because these damages present a covered claim, Wilshire must defend the entire suit.

18

Id. at 227.  In Wilshire, although the insurer contended that the underlying complaint defined RJT's work to include the entire house, the court found otherwise, stating, "To the contrary, the complaint makes clear that RJT was brought onto the job as the 'foundation repair subcontractor.'" Id. at 227 n.16.  See also E & R Rubalcava Constr., Inc., 147 F. Supp. 2d 523, 528 (N.D. Tex. 2000) (where insured was hired to construct foundations for homebuilder, damage to homes from defective foundation work not excluded since "that particular part" of the property on which insured worked were the foundations) (citing Cruse).

The facts in the present case are materially distinguishable from those of Cruse and Wilshire, and in the court's opinion, dictate a different result.  In Cruse and Wilshire, the insureds were hired to perform foundation leveling or repair services and in each case, the insured performed work on the foundation only, not the remaining parts of the house.  The Cruse court noted, in fact, that this is what distinguished Cruse from other cases in which an insured's work product was the entire structure or building project, rather than simply a portion thereof.  Cruse, 938 F.2d at 603-604.  See Essex Ins. Co. v. Patrick, No. Civ A. SA05CA337-OG, Civ. A. SA05CA629-OG, 2006 WL 3779812 (N.D. Tex. Oct. 16, 2006) (noting distinction in Cruse, and finding exclusion applicable to all claimed damage where insureds were responsible for entire building project, since "[t]here is nothing to suggest

19

that damages occurred to any property that was not part of the work undertaken by the insureds"). Here, Absolute was hired by the Peerbooms not to repair or level the foundation, but to raise the elevation of the entire home. Numerous cases have found the business risk exclusions applicable in analogous circumstances.

For example, and in contrast to <u>Cruse</u> and <u>Wilshire</u>, the insured in <u>Grinnell Mutual Reinsurance Co. v. Lynne</u>, 686 N.W.2d 118 (N.D. 2004), Lynne, was hired by one Larson to construct a new foundation for a farmhouse. This required Lynne to lift the house from its existing foundation and support the house with iron timbers while constructing a new foundation under the house. While Lynne was in the process of raising the house, the iron timbers "rolled over." <u>Id</u>. at 121. The house fell off the support jacks and into the basement approximately three feet. <u>Id</u>. The insurer argued that exclusions (j)(5) and (j)(6) applied to exclude coverage under its CGL policy. The insured argued that the "particular part" of the property on which he was working was not the house, but rather the foundation of the house, and that any damage to the house should be covered. <u>Id</u>. at 124. The court, however, held that exclusion (j)(5) of the policy operated to preclude coverage for the insured's claim for defense and indemnity against Larson's claim for damage to his house, stating:

> The language of the policy indicates "[t]hat particular
> part of real property" on which Lynne was working is
> subject to the exclusion. The particular part of real
> property on which Lynne was working was the house.

> Thus, damage to the house resulting from Lynne's work
> will not be covered by the policy due to the exclusions
> included in the policy.

Id. at 125.  In concluding that the business risk exclusion

precluded coverage for damages to the house, the court noted that

the purpose of such exclusions "is to prevent policyholders from

converting liability insurance into protection from foreseeable

business risks" and that "[a] commercial liability insurance

policy is not meant to act as a warranty of the insured's work."

Id. at 124.

As in Grinnell, the court in Barber v. Berthiaume, No.

CV054009532S, 2009 WL 3740736 (Conn. Super. Oct. 19, 2009), found

the business risk exclusion applicable where a house toppled and

sustained damage while the insured contractor was in the process

of raising the house so that he could construct new piers under

the house.  Citing Grinnell, the court found the damage to the

house was excluded because "the house in this case was being

raised as part of the contract Berthiaume was obligated to

perform" and "the house would not have toppled if it was not

raised by Berthiaume."  Id. at 1.

In Auto-Owners Insurance Co. v. Chorak & Sons, Inc.,

No. 07 C 4454, 2008 WL 3286986 (N.D. Ill. Aug. 8,2008), as part of

his contractual duty to strengthen the frame construction of a

home, the insured contractor had to lift the house one to two

inches off its foundation to replace the home's "sill plate," a

two inch by six inch wooden plate that sits atop the foundation.
The insured placed floor jacks throughout the property for use in
raising the house.  When the insured was raising the house, it
slid off its foundation, resulting in catastrophic damage to the
home's structure.  Id. at 1.  The insured argued that exclusions
j(5) and j(6) only excluded damage to the sill plate, since that
was the "particular part" of the property on which it was
performing work.  Id. at 2.  The court, however, agreed with the
carrier's position that the damage to the entire house fell within
exclusions j(5) and j(6), since "the structure on which Chorak
(the insured) was working was the entire house.  Chorak was tasked
with replacing the sill plate.  This required work in the entire
house; that is, Chorak had to raise the entire house in order to
complete the assigned task," id. at 3, and thus the damage to the
house was excluded.  The court noted that this result was
consistent with the purpose of CGL policies, stating,

> Excluding the damage to the house under exclusions j(5)
> and j(6) also effectuates the cited purpose of CGL
> policies.  Such policies are "intended to protect the
> insured from liability for injury or damage to persons
> or property of others; they are not intended to pay the
> costs associated with repairing or replacing the
> insured's defective work and products." Traveler's, 258
> Ill. Dec. 792, 757 N.E.2d at 503; State Farm Fire and
> Cas. Co. v. Tillerson, 334 Ill. App. 3d 404, 268 Ill.
> Dec. 63, 777 N.E.2d 986, 993 (Ill. App. Ct. 2002)
> ("these exclusions are premised on the theory that
> liability policies are not intended to provide
> protection against the insured's own faulty workmanship
> or product, which are normal risks associated with the
> conduct of the insured's business").  Here, Chorak
> requests coverage for its defective work.  Put another

> way, it asks for Auto-Owners to cover damage as a result
> of the normal risks associated with lifting a home.
> Chorak does not request coverage for damage to any other
> property.

Id. at 4.

In Erie Insurance Exchange v. Pugh, No. 98 CA 53, 1999 WL 812292 (Ohio App. 2 Dist. Oct. 8, 1999), the insured contractor was hired to construct an addition and basement renovation of a residence.  The insured's employee was working on the basement foundation when a weakened control support gave way and the main residence collapsed into the basement.  Id. at 1.  The collapse of the residence was found to be the "direct result of undermining all footers on the foundation walls without proper shoring of the residence and the footers."  Id.  The court held the exclusion applied to the damage to the residence, since "'that particular part of real property upon which operations are being performed' involved the foundation which supported the entire residence, and since such operations set off the reaction which caused all of the subsequent damage."  Id. at 2.  In so holding, the court observed that "the isolation of the foundation as the only place where faulty operations were being performed when the house fell down, and the assessment of damages accordingly, could lead to completely illogical results."  Id.[7]

---

[7]     Another case that bears mention is Frankel v. J. Watson Company, Inc., 21 Mass App. Ct. 43, 484 N.E.2d 104 (1986), in which the insured was hired to move a farmhouse from its existing location to a new site, and to install it upon a new concrete

In the case at bar, notwithstanding defendants' characterization of the scope of Absolute's work as being confined to the foundation, it is clear from the Peerbooms' complaint (as well as from their description of the work in their memorandum in response to Lafayette's motion) that Absolute was hired not to merely work on the foundation but instead to raise the elevation of the Peerboom's entire home to satisfy FEMA requirements and thereby qualify for federal flood insurance.  This was to be accomplished by using a system of jacks to lift the entire house, including the existing slab, and then constructing a new concrete foundation on which the home would ultimately rest.  Unlike the

_____

foundation which the insured was to construct.  After the house was moved onto the new foundation, the superstructure began to sag, causing it extensive damage.  The court held the damage to the structure itself was not excluded under a policy exclusion for property damage to "that particular part of any property ... the restoration, repair or replacement of which ... is necessary by reason of faulty workmanship thereon by ... the insured."  The court interpreted the exclusion as "creating a distinction between damage to the insured's work product and damage to larger units of which the insured's work product is but a component," id. at 105-06 (citations omitted), and held that "the 'particular part' of the property affected by the alleged faulty workmanship of the insured was the foundation," id. at 106.  In Frankel, in contrast to the present case, the structure was not damaged in the move itself; rather, the damage occurred after the work was completed and occurred because the new foundation was defective.  Had the insured dropped the home in the move, the result would likely have been different.  In any event, Donovan v. Commercial Union Insurance Co., 44 Mass. App. Ct. 596, 692 N.E. 2d 536 (1998), the court questioned Frankel's narrow interpretation of the reach of the exclusion, and it has since been suggested that there is "significant doubt as to whether Frankel is still good law in Massachusetts."  See Federal Ins. Co. v. Hermitage Ins. Co., No. Civ. A. 00-12310-DPW, 2002 WL 31194872, at 1 (D. Mass. Sept. 25, 2002).

insureds in <u>Cruse</u> and <u>Wilshire</u>, Absolute performed work, not on the foundation only, but on the entire house; and this fact distinguishes the present case from <u>Cruse</u> and <u>Wilshire</u> and other similar cases where a contractor undertakes to work on a discrete part of a structure and defects in his work cause damage to other property.  The fact that the Peerbooms recognize that Absolute's work included the structure of the home, and not only the foundation, is implicit in the various allegations in their complaint that Absolute "was performing the job *on the Peerbooms' structure*," that it was Absolute's duty "to provide even support *to keep the structure's integrity*," that Caballero had "the requisite expertise and equipment *to raise the structure* twenty-four inches above its then-current elevation *without damaging the structure*," and that they entered into a contract with Absolute to "*raise the Peerbooms' structure*."  (Emphasis added).  And in response to the motion, they repeatedly state that Absolute was hired "*to raise the structure*," and was in the business of "*raising houses*."  (Emphasis added).  In addition, they state that prior to Absolute's beginning the jacking procedure, they contacted its insurance agent to inquire whether coverage was in force "in the event the house was dropped."

From the foregoing, it is manifest that the "particular part" of the property on which Absolute was hired to perform work and on which it was working was the Peerbooms' entire house.  The risk

25

that the house would fall and sustain damage in the process of
Absolute's house-raising operation and sustain damage as a result
was not merely a fortuitous event but a business risk which falls
squarely within exclusions j(5) and j(6).[8]  For this reason,
Lafayette's motion for summary judgment is well taken.[9]

---

[8]     Contrary to the Peerbooms' urging, the exclusion
applies, notwithstanding that Absolute was working to raise the
house, as opposed to working *on* the house.  See NGM Ins. Co. v.
Stoltzfus Constr., LLC, No. 1:09-CV-01717, 2011 WL 397667 (M.D.
Pa. Jan. 10, 2011) (finding reasoning in Grinnell lucid and
persuasive, and noting that Grinnell court applied exclusion to
damage to the house notwithstanding that insured in Grinnell "was
working on raising the house rather than working on the house
itself").

[9]     The court notes that in addition to these exclusions,
Lafayette also relies on the policy exclusion for "property
damage" to
     (1) Property you own, rent, or occupy, including any
     costs or expenses incurred by you, or any other person,
     organization or entity, for repair, replacement,
     enhancement, restoration or maintenance of such property
     for any reason, including prevention of injury to a
     person or damage to another's property
     ...
 Pointing to Webster's Dictionary's definition of "occupy" to mean
"to take or hold possession or control of" or "to reside in as an
owner or tenant," Lafayette contends for application of exclusion
(j)(1), which precludes coverage for "property damage" to
"[p]roperty you own, rent, or occupy," claiming that on the date
in question, Absolute had control of the Peerboom home.  See
SnyderGeneral Corp. v. Century Indem. Co., 113 F.3d 536, 539 (5th
Cir. 1997) (observing that under Texas law, the care, custody and
control exclusion only precludes insurance coverage in cases in
which the insured totally and physically manipulates property).
Because the court concludes that exclusions j(5) and j(6) preclude
the court need not determine whether exclusion j(1) is also
applicable.

Accordingly, it is ordered that Lafayette's motion for summary judgment is granted.[10]

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 2nd day of June, 2011.


                                   /s/Tom S. Lee
                                   UNITED STATES DISTRICT JUDGE

---

[10]   The court notes that the Peerbooms have included in their response to the motion a Rule 56(f) request for continuance of the motion so they can conduct discovery toward ascertaining what caused the house to fall.  However, since the proposed discovery is not pertinent to the basis of the court's conclusion that summary judgment is in order, their request will be denied.